UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MARK KELLEY II,

                Plaintiff,

                                          Case Number 12-10002

v.                                      Honorable Thomas L. Ludington

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

_____ /

**OPINION AND ORDER OVERRULING PLAINTIFF'S OBJECTIONS, ADOPTING REPORT AND RECOMMENDATION, DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND AFFIRMING JUDGMENT OF ADMINISTRATIVE LAW JUDGE**

       Plaintiff Mark Kelley, diagnosed with HIV,[1] filed an application for social security disability benefits. Defendant Commissioner of Social Security concluded that Plaintiff is not disabled and denied the application. Plaintiff requested a hearing before an administrative law judge, and received one before Administrative Law Judge Timothy Scallen. He too denied Plaintiff's application.

       Plaintiff then appealed to this Court. The gravamen of his complaint is that substantial evidence does not support Judge Scallen's finding that Plaintiff is not disabled. The case was referred to Magistrate Judge Steven Whalen for general case management. Both parties filed motions for summary judgment. Addressing the motions, Magistrate Judge Whalen issued a

---

[1] The human immunodeficiency virus (HIV) is a chronic medical condition that "gradually destroys the immune system . . . . There are effective ways to prevent complications and delay, but not always prevent, progression to AIDS." U.S. National Library of Medicine, *HIV Infection* (May 30, 2012), *available at* http://www.nlm.nih.gov/medlineplus/ency/article/000602.htm. Federal regulations provide that a person diagnosed "with HIV infection, including one with a diagnosis of acquired immune deficiency syndrome (AIDS), may be found disabled" if he meets certain enumerated criteria (or has a condition medically equivalent to those criteria). 20 C.F.R. part 404, subpart P, app. 1, §§ 14.00F, 14.08A–K. Here, as discussed below substantial medical evidence supports the Commissioner's conclusion that Plaintiff's condition, though undoubtedly serious, does not meet those criteria.

report recommending that the Court deny Plaintiff's motion, grant Defendant's motion, and affirm Judge Scallen's decision.

Any party may file written objections to a report and recommendation. 28 U.S.C. § 636(b)(1). The district court "shall make a de novo determination of those portions of the report . . . to which objection is made." *Id.* The Court is not obligated to further review the portions of the report to which no objection was made. *Thomas v. Arn*, 474 U.S. 140, 149–52 (1985).

Plaintiff filed an objection. Reiterating that Judge Scallen's decision is not supported by substantial evidence, Plaintiff's principal argument is that Judge Scallen "just simply cherry-picks the medical records looking for non-relevant medical records to substantiate his decision." Pl's Objection 3, ECF No. 13.

Contrary to Plaintiff's argument, Judge Scallen's meticulous, thoroughly-reasoned decision is supported by substantial evidence. Plaintiff's objection will be overruled. Judge Whalen's report and recommendation will be adopted. Plaintiff's motion will be denied. Defendant's motion will be granted. And the decision of Judge Scallen will be affirmed.

## I

## A

The Court reviews the Commissioner's decision to determine whether the "factual findings . . . are supported by substantial evidence." *Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028 (6th Cir. 1990) (citing 28 U.S.C. § 405(g)). "Substantial evidence," the Sixth Circuit instructs, "is more than a scintilla of evidence but less than a preponderance." *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). That is, it "is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Richardson v. Perales*, 402 U.S. 389, 401 (1971).   The Sixth Circuit cautions that the Commissioner's findings "findings based on the credibility of the applicant are to be accorded great weight and deference."   *Walters v. Comm'r.*, 127 F.3d 525, 531 (6th Cir. 1997).   If the Commissioner's decision (including the assessment of the claimant's credibility) is supported by substantial evidence, it must be affirmed, even if substantial evidence supports the opposite conclusion. *Id.*; *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389–90 (6th Cir. 1999).

**B**

The Commissioner's decision is made according to a five-step process.   20 C.F.R. § 404.1520(a)(4)(i)–(v).   A claim is allowed when it is demonstrated that: (1) the claimant is not engaged in "substantial gainful employment"; (2) the claimant suffers from a severe impairment which has lasted or is expected to last for twelve continuous months; (3) the impairment meets or is equal to one of the enumerated impairments; (4) the claimant does not retain the "residual functional capacity" to perform his "past relevant work"; and (5) the claimant is unable to perform any other gainful employment in light of the claimant's "residual functional capacity, age, education, and work experience."   20 C.F.R. § 416.920(a)(4)(i)–(v).   The claimant has the burden of proof through the first four steps.   *Preslar v. Sec'y of Health and Human Servs*., 14 F.3d 1107, 1110 (6th Cir. 1994) (citing 20 C.F.R. § 404.1520 (1982)).   If the analysis reaches the fifth step, the burden transfers to the Commissioner.   *Id.*

## II

### A

Plaintiff is 31-year-old man.  He completed high school in 1999.  R. 172.  In 2009, he took college classes to become a court reporter.[2]  R. at 236.

His past relevant work experience included customer account executive, escrow specialist, general laborer, and reviewer of real estate title documents.  R. at 173.  His most recent job, in 2007, was working for a title company.  R. at 37.

Plaintiff filed an application for Social Security disability benefits on June 29, 2010.  R. at 13.  He alleged that his disability began on July 7, 2008.  R. at 171.  During the hearing before the administrative law judge, Plaintiff amended his alleged onset date to January 1, 2010.  *See* R. at 53–54.[3]

To evaluate Plaintiff's claim, however, it is necessary to begin not in 2010, but 2007.

### B

#### 1

Plaintiff stopped working in 2007.  R. at 38.  "I had shingles,"[4] Plaintiff recalls, explaining: "I took some time off due to that."  R. at 38.  In December 2007, Plaintiff began collecting unemployment insurance.

---

[2] *See* R. at 236 ("[Plaintiff] is excited about starting school for court reporting, he will get an Associate degree after 3 years."), R. at 224 ("In court Reporter School and getting all A's.").

[3] During the hearing, Plaintiff testified that he received unemployment benefits until the "early part of 2010." R. at 39.  On advice of counsel, Plaintiff agreed to amend the onset date to "just take that issue right out of the bucket there." R. at 54.

[4] "Herpes zoster, also known as zoster and shingles," the Centers for Disease Control (CDC) explains, "is caused by the reactivation of the varicella zoster virus (VZV), the same virus that causes varicella (chickenpox). Anyone who has had varicella or gotten varicella vaccine can develop herpes zoster.  Most people typically have only one episode of herpes zoster in their lifetime.  However, second and even third episodes are possible. . . .  The

-4-

**2**

In June 2008, Plaintiff was diagnosed with HIV.  R. at 186.  In December, doctor, Dr. Jonathan Cohn, examined Plaintiff.  R. at 186–88.

The exam revealed no rashes (suggesting that the shingles had healed).  R. at 187. Plaintiff likewise reported no fatigue, constipation, diarrhea, or vomiting.  R. at 186.  Weighing in at 143 pounds, Plaintiff was described as "[w]ell nourished and well developed."  R. at 187.

Dr. Cohn also reported that Plaintiff was "doing well on antiretroviral therapy.  He feels much improved, stronger, healthier."  R. at 186.  Noting that Plaintiff reported "100% adherence" to the antiretroviral regimen, Dr. Cohn also noted that Plaintiff was not only "[c]linically much improved," but also "more cheerful."  R. at 188.  Finally, Dr. Cohn noted an increase from 38 to 92 in Plaintiff's CD4.[5]

**3**

The Wayne State University Physician Group also treated Plaintiff's HIV.  *See* R. at 19. In May 2009, Plaintiff had an appointment with the group.  R. at 224–26.  At that exam, Plaintiff reported that he was "[f]eeling well." R. at 224.  He also noted that he had started taking college classes to become a court reporter and was "getting all A's."  R. at 224.

---

rash develops into clusters of clear vesicles.  New vesicles continue to form over three to five days and progressively dry and crust over.  They usually heal in two to four weeks."  CDC, *Shingles Clinical Overview* (Oct. 23, 2012), *available at* http://www.cdc.gov/shingles/hcp/clinical-overview.html.

[5] "CD4 is an infection-fighting white blood cell that coordinates the immune response.  HIV infects and kills CD4 cells, weakening the immune system.  CD4 count is a useful indicator of immune system health and HIV/AIDS progression.  A normal CD4 count is approximately 500 to 1,400 cells/mm[3] of blood, but individual counts can vary."  *Edel v. Astrue*, 6:06-CV-0440 LEK/VEB, 2009 WL 890667, at *3 n.5 (N.D.N.Y. Mar. 30, 2009).

Again, his physical exam revealed no rashes.  R. at 224.  Again, he reported no fatigue, diarrhea, or vomiting.  R. at 224.  And again, he was described as "[w]ell nourished and well developed."  R. at 225.

Plaintiff psychiatric state was also described positively, with the notes reflecting: "No unusual anxiety or evidence of depression."  R. at 225.  And his CD4 was trending in the right direction as well, increasing from 92 to 104.  R. at 226.

**4**

In March 2010, Plaintiff had dinner "and then decided to go to drink."  R. at 191.  The alcohol did not sit well in his system, however, and he vomited.  R. at 191.  Repeatedly.  R. at 191.  Some of the vomit, he noticed, had "a few streaks of blood."  R. at 191.  Concerned, around 11 pm Plaintiff went to the emergency room.  *See* R. at 190–96 (emergency room records).

There, doctors concluded that the blood was caused not by an underlying serious problem, but by "a Mallory-Weiss tear from dry heaving."[6]  R. at 192.  Plaintiff's physical exam was similarly positive, with the records relaying: "Strength is 5/5 proximally and distally in both upper and lower extremities."  R. at 191.   The records also reflect that Plaintiff was "completely asymptomatic" of HIV.  R. at 192.  And Plaintiff's CD4 count was "in the 400[s], almost 500s."  R. at 191.

About an hour after Plaintiff arrived at the emergency room, he was discharged.  R. at 190, 192.

---

[6] "A Mallory-Weiss tear," the U.S. National Library of Medicine explains, "occurs in the mucus membrane of the lower part of the esophagus or upper part of the stomach, near where they join.  The tear may bleed.  Mallory-Weiss tears are usually caused by forceful or long-term vomiting or coughing."  U.S. National Library of Medicine, Mallory-Weiss Tear (Nov. 11, 2010), *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001315/.

-6-

**5**

Plaintiff, as noted, filed an application for Social Security disability benefits on June 29, 2010, alleging that his disability began in July 2008. R. at 13, 171. Enumerating the conditions that limited his ability to work, Plaintiff listed: "(1) Medications make me ill; (2) Depression; (3) Can't concentrate; (4) Balance and coordination [are] unstable due to medications; (5) Anxiety; (6) I'm very weak at times when standing for short periods; (7) Uncontrollable bowel movements at times; (8) Dizziness and headaches occur when reading for short time; (9) Too sick to get out of bed a lot of times; (10) Aids." R. at 171 (formatting omitted).

**6**

**a**

On November 3, 2010, Plaintiff was again examined by the Wayne State University Physician Group. R. at 212–14. Plaintiff reported no headaches, fatigue, diarrhea, vomiting, or depression. R. at 212–13; *see also* R. at 212 ("No new health problems to report.").

Again, his physical exam was positive, revealing Plaintiff to be both "[w]ell nourished" and "[w]ell developed." R. at 213. His psychiatric state was also described positively: "The patient is not anxious, does not have flight of ideas, has normal attention span and concentration." R. at 214.

But Plaintiff's CD4 count had decreased, to 78. R. at 214. Plaintiff acknowledged that he "had a period of a few months stopping his meds completely in the spring of this year." R. at 212. And, although he resumed taking his medication in the summer of 2010, he also acknowledged "missing 1 or 2 doses weekly since then." R. at 212. To address this issue, the

staff had a "[l]ong discussion" with Plaintiff about the importance of taking his medication and not missing doses.  R. at 214.

He states he will do better," the notes reflect, continuing:  "Will get him back in 2 months or so and readdress adherence. . . .  He agreed to be seen by our Behavioral Health Team today re coping with his diagnosis."  R. at 214.

**b**

The same day, Plaintiff followed up with the behavioral health team and underwent a psychological assessment.  *See* R. at 262–66.  His responses presented "several issues of concern, starting with thoughts of suicide."  R. at 266.  Probing deeper into this issue, the counselor "determined that [Plaintiff] does not have a plan or intent to bring imminent harm to himself or others."  R. at 266.  He did, however, have a problem with drinking.

Specifically, the discussion "revealed that [Plaintiff] drinks to provide an 'escape' from his thoughts and 'bad life.'"  R. at 266.  Plaintiff recognized that "this is not a healthy behavior" and that therapy was appropriate.  R. at 266.  But, the records reflect, he told the counselor that "just at this particular time, he's not ready."  R. at 266.

**7**

On January 17, 2011, Plaintiff underwent physical and psychiatric assessments performed by Social Security Administration consulting doctors.  R. at 197–208.

**a**

Dr. Ernesto Bedia administered the physical assessment.  R. at 201–08.  Dr. Bedia described Plaintiff as "pleasant and cooperative, active."  R. at 202.  Reviewing Plaintiff's symptoms, Dr. Bedia recorded that Plaintiff's "appetite has decreased.  No nausea or vomiting."

R. at 202.  Plaintiff also "complains of uncontrolled bowel movements since starting retroviral therapy.  The patient states that he feels gassy and bloated.  Occasionally has diarrhea/soft stools.  No blood per rectum.  He has occasionally lost control and soiled his under garments.  This makes him a little bit anxious for going outside."  R. at 201.

Plaintiff's physical exam, however, was generally positive.  "Good muscle tone and mass," Dr. Bedia observed, noting: "Motor strength is 5/5 bilaterally."  R. at 202.  Likewise, Plaintiff exhibited no "skin rash, dermatitis, or ulcers."  R. at 202.

"Based on today's exam," Dr. Bedia concluded, "the patient does not have any physical restrictions for activity."  R. at 203.

**b**

Dr. F. Qadir administered the psychological assessment.  R. at 197–200.  Plaintiff told Dr. Qadir that he "goes to church occasionally.  He does light household chores.  His sister helps with the household chores and cooking.  He is not able to cook a proper meal.  He states he has good days and bad days.  On bad days, he cannot get up because he is tired.  On good days, he likes to go out."  R. at 198.

Describing Plaintiff's mental status, Dr. Qadir wrote: "His psychomotor activity is normal.  He has no motivation.  He has good insight into his illness.  He tends not to exaggerate his symptoms. . . .  His thought process is well organized and easy to follow."  R. at 198.

Concluding the assessment, Dr. Qadir gave Plaintiff a "guarded" prognosis, explaining: "The combination of symptoms of his medical condition and depression can cause problems with his ability to work."  R. at 199.

**8**

In February 2011, Plaintiff's claim for disability benefits was denied.  R. at 62–67. Plaintiff requested a hearing before an administrative law judge.

**9**

In March 2011, Plaintiff was once again examined by the Wayne State University Physician Group.  R. at 209–11.  Plaintiff reported that since his last visit (four months earlier) he had "full adherence" to his treatment regimen.  R. at 209.  But Plaintiff reported that he was struggling with "depression and overall frustration with having HIV and trying to get over feelings that he has that he is 'poisonous.'"  R. at 209.

Plaintiff's physical exam was again generally positive.   Again, he denied fatigue, diarrhea, and nausea.  R. at 209.[7]  Again, his constitution was described as "[w]ell nourished and well developed."  R. at 210.  (As he had in December 2008, Plaintiff weighed in at 143 pounds. *Compare* R. at 187, *with* R. at 210.)  His psychiatric state was also described positively: "No unusual anxiety or evidence of depression."  R. at 210.  His CD4 count, however, had dipped back into the 80s.  R. at 211.

**10**

In August, Plaintiff returned to the University Health Center for another psychological assessment.  R. at 268–75.  He reported that he was "[e]xperiencing crying spells, anxiety, panic attacks, don't like being around people, was recently robbed at gun point, feels paranoid, sleep disturbances . . . .  Feels poisonous.  Body image issues and low self-esteem."  R. at 273.

---

[7] Plaintiff did have a "scrotal rash," for which he was prescribed Nizoral cream.  R. at 211.  (A fungal rash, it was not connected with Plaintiff's shingles outbreak four years earlier.)

Assessing Plaintiff, the counselor reported that he "appears to be high functioning in many areas of his life," elaborating that Plaintiff "on the out[side] appears to have no issues and is high functioning, but speaking with him does reveal there is more than what's is [sic] being revealed."  R. at 275.

### C

On September 14, 2011, a hearing was held before Administrative Law Judge Timothy C. Scallen.  *See* R. at 33–61 (transcript).

### 1

Plaintiff was the first to testify.  Describing his ailments, Plaintiff explained: "I have uncontrollable bowel movements.  I'm very tired, nauseous . . . .  I get dizzy."  R. at 41.  Plaintiff explained that "there are a lot of days that I can't get out of bed."  R. at 42.  Asked how many such "bad days" he had in an average week, Plaintiff answered: "I'd say about — honestly, about — I might say five."  R. at 43.

Plaintiff also reported having anxiety attacks five days a week, noting: "Like, right now, I'm about to feel one. . . .  I sweat, I get — I just — I freak out.  I mean, I'm looking behind me. I don't —  I don't know what's . . . coming up."  R. at 44–45.

Judge Scallen asked Plaintiff whether he tended to his personal needs (dressing, showering, and "things of that nature").  R. at 45–46.  "Sometimes," Plaintiff answered, "but my sister helps as well."  R. at 46.  Plaintiff went on to explain that he lived with his older sister and her three children (ages 7, 11, and 17).  R. at 46, 48.

Asked whether he helps doing work around the house, Plaintiff testified that "a lot of days I just like to lay in bed so I really, really don't.  Every now and then, to be honest, I will

-11-

take the trash out or, you know, clean up, you know — [the] bathroom to an extent, but I have a large family." R. at 46.

Turning to how he spends his time, Plaintiff explained that "my current hobb[y] is watching TV." R. at 47. Elaborating on what he liked to watch, Plaintiff first cited Judge Judy, explaining: "She's tough, but she's fair and I also like the Food Network. . . . Paula Deen and Ina — love them." R. at 48.

Plaintiff also reported that he helped his nieces and nephews with their homework, explaining: "Like, I'm asking about school and I'm helping with homework, you know. . . . [T]hey come to me with a problem, you know, first with the homework because my sister is good with certain curriculum and I am as well. I mean, that's — you know, so I will help them." R. at 48–49. Judge Scallen then inquired of Plaintiff's physical abilities, asking:

Q:    How much can you carry or lift? You have any — do you have any physical limitations in terms of being able to carry or lift things?

A:    I'd say about five, 10 pounds.

Q:    Five to 10 pounds?

A:    Yes, your honor.

Q:    Why so little?

A:    Because I'm extremely weak a lot.

Q:    Okay.

A:    Which makes me feel terrible, but I'm dealing.

Q:    All right, mainly from the extreme weakness and fatigue[?]

A:    I would say, your honor.

Q:    All right, do you have any trouble sitting or standing at one time?

-12-

A:      Sitting, no.  If I'm standing, like walking or —

Q:      Just standing up.

A:      For a long period of time, no, but I can stand.  Yeah. . . .

Q:      How about doing things like stooping[,] kneeling, crouching and crawling, those types of activities?

A:      I can do those.

Q:      Any problem with your upper extremities, your arms?  For instance, being able to reach out and get something[?]

A:      Well, due to the shingles, I can shake sometimes because the shingles messed up my nervous system —

Q:      Okay and —

A:      — so I tremble a lot, yes.  Yes.

Q:      You still do that today?

A:      Tremble?  Yes, sir, probably for the rest of my life.

R. at 49–50, 51.  Plaintiff's counsel also questioned Plaintiff.  He elicited that Plaintiff, following his diagnosis, had suffered rashes, oral thrush, and lost 30–35 pounds R. at 55–56.

**2**

Next to testify was a vocational expert, Elizabeth Pasikowski.  She classified Plaintiff's past relevant work as "a laborer, unskilled, light to medium[;] customer service representative, semiskilled, sedentary[; ] and as an escrow specialist, semiskilled, sedentary."  R. at 58.

Judge Scallen asked Ms. Pasikowski to assume a hypothetical person that had the same age, education, and work history as Plaintiff and the following restrictions:

[M]edium exertional level.[8]   Also . . . no repetitive pushing and pulling, no climbing of ropes, ladders and scaffolds, frequent balancing, no repetitive pushing and pulling, no climbing of ropes, ladders and scaffolds, frequent balancing, no repetitive . . . handling and fingering.   Also, avoid concentrated exposure to unprotected heights, moving machinery and also limit to simple, routine, repetitive tasks.

R. at 58.   With these restrictions, the vocational expert concluded, Plaintiff would be unable to perform his past relevant work — or indeed any work "at the medium level."  R. at 58.

But, the vocational expert further concluded, such a person would be able to perform a number of jobs at the "light"[9] and "sedentary"[10] levels, including greeter (1,400 positions in the regional economy); gate tender (1,600); information clerk (1,300); visual surveillance monitor (1,700); information clerk (1,200); and ID clerk (1,400).  R. at 58–59.

**3**

Finally, Plaintiff's attorney made a brief closing statement.   He urged Judge Scallen to consider that Plaintiff had "manifestations of HIV — clearly, he has manifestations.   He has full blown AIDS.   He was diagnosed in 2008.   He's never had — from my review of the records, he's never had a T cell count over 100.   He's on some serious medications.   He's had numerous problems and on top of that, the mental health concerns."  R. at 59–60.

---

[8] "Medium work," 20 C.F.R. § 416.967(c) provides, "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.   If someone can do medium work, we determine that he or she can also do sedentary and light work."  A similar definition of "medium work" is provided by 20 C.F.R. § 404.1567(c).

[9] "Light work," 20 C.F.R. § 416.967(b) provides, "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.   Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."

[10] "Sedentary work," 20 C.F.R. § 416.967(a) provides, "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. "

-14-

**D**

On October 4, 2011, Judge Scallen issued a decision denying Plaintiff's application.  R. at 10–25.  At step one, Judge Scallen found that Plaintiff has not engaged in substantial gainful activity since the amended alleged onset date of January 1, 2010.  R. at 15.  At step two, Judge Scallen determined that Plaintiff has two severe impairments: "Human immunodeficiency virus/asymptomatic (HIV); [and] adjustment disorder."  R. at 16.

But at step three, Judge Scallen concluded that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  R. at 16.  (That appendix, in particular § 14.08 of that appendix, establishes criteria for determining whether a person "with HIV infection, including one with a diagnosis of acquired immune deficiency syndrome (AIDS), may be found disabled.  20 C.F.R. part 404, subpart P, app. 1, § 14.00F.)

In reaching this determination, Judge Scallen first detailed the requirements of § 14.08K.[11]  R. at 16.  He then found that "the evidence did not show that the claimant's impairment has met these requirements.  For example, the claimant's HIV appeared to be asymptomatic."  R. at 16.  not significantly impaired."  R. at 16.

---

[11] That section provides that a claimant has a "severe impairment" if he exhibits:

Repeated . . . manifestations of HIV infection . . .  resulting in significant, documented symptoms or signs (for example, severe fatigue, fever, malaise, involuntary weight loss, pain, night sweats, nausea, vomiting, headaches, or insomnia) and one of the following at the marked level:

1.  Limitation of activities of daily living.

2.  Limitation in maintaining social functioning.

3.  Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

20 C.F.R. part 404, subpart P, app. 1, § 14.08K.

-15-

Turning to Plaintiff's adjustment disorder, Judge Scallen similarly found that the evidence did not show "more than mild limitations in [Plaintiff's] ability to maintain activities of daily living, or social functioning." R. at 16.

"In activities of daily living," Judge Scallen first found, "the claimant has a mild restriction. During a typical day, the claimant wakes up, performs personal hygiene activities, without difficulty, eats a meal and takes a nap. He helps care for pets by feeding and cleaning them. He reported that he could make sandwiches and cook a frozen meal on a daily basis. He performs some household chores such as cleaning, picking up debris outside and around the home." R. at 16.

"In social functioning," Judge Scallen likewise found, "the claimant has mild difficulties. The claimant reported that he enjoyed spending time with others but prefers talking on the telephone or using the computer. . . . On January 17, 2011, the claimant stated that he would go to church occasionally and on good days, he enjoyed going out." R. at 17.

Addressing Plaintiff's cognitive abilities, Judge Scallen wrote: "With regard to concentration, persistence or pace, the claimant has moderate difficulties. The claimant stated that he did not know how long he could pay attention. He stated that he could follow spoken and written instructions 'ok.'" R. at 17. And, Judge Scallen observed, Plaintiff "also reported that he was going back to school as a court reporter, which suggests that his ability to concentrate was not significantly impaired." R. at 16.

Between steps three and four, Judge Scallen thus concluded that Plaintiff retained the residual functional capacity for "medium work as defined in 20 CFR 404.1567(c) and 416.967(c)," but "no repetitive pushing or pulling; no climbing ropes, ladders or scaffolds;

frequent balancing; no repetitive handling or fingering; avoid concentrated exposure to unprotected heights and moving machinery; simple, routine, repetitive tasks." R. at 17. Judge Scallen explained that

> the severity of his HIV/AIDS as alleged by the claimant is not supported within the medical and other objective evidence of the file. For instance, treatment reports from the University Physicians Group showed that he was doing well overall. On May 22, 2009, he even reported that he was excited to about starting school for court reporting. He denied any new health problems associated with HIV. According to a November 3, 2010 medical report, the claimant admitted stopping his medications completely and restarted ART in the summer but missed one or two doses [per week]. Despite stopping his medications, the claimant denied any new health problems such as chills/rigors, fatigue, fever, night sweats or weight loss. He denied abdominal pains, diarrhea, nausea or vomiting. The examination was within normal limits . . . . On January 17, 2011, Dr. Bedia noted the claimant's allegations of a positive HIV status with sypmptoms of headaches, uncontrolled bowel movements, depression and anxiety. The doctor noted evidence of erythema with irregular borders and overlying white patches in his mouth. However, the remainder of the examination appeared to be within normal limits. The claimant exhibited good muscle tone and mass. There was no evidence of tenderness or erythema in the joints and he had full range of motion. He exhibited full motor strength of 5/5 bilaterally and he walked with a normal gait.

R. at 19 (internal citation omitted). Further finding that Plaintiff had several "credibility issues," Judge Scallen wrote: "the claimant's statement's concerning the intensity, persistence and limiting effects of [his] symptoms are not credible to the extent they are inconsistent with the above residual functional capacity." R. at 18.

At step four, Judge Scallen concluded that Plaintiff was unable to perform any of his past relevant work. R. at 21. Finally, at step five Judge Scallen concluded that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." R. at 21. Consequently, Judge Scallen concluded that Plaintiff was not disabled. R. at 22.

**E**

Plaintiff requested a review by the appeals council. *See* R. at 7–9. The council declined to review Judge Scallen's decision. R. at 1–6. This appeal followed.

**F**

In January 2012, Plaintiff filed suit in this Court. ECF No. 1. The case was referred to Judge Whalen pursuant to 28 U.S.C. § 636. ECF No. 3. In April 2012, Plaintiff filed a motion for summary judgment. Defendant also moved for summary judgment.

In February 2013, Judge Whalen issued a report recommending that the Court deny Plaintiff's motion, grant Defendant's motion, and affirm Judge McClain's decision. ECF No. 12.

Plaintiff filed objections to the report and recommendation. ECF No. 13.

**III**

**A**

Plaintiff first "objects to the assessment by the Magistrate Judge that [Judge Scallen's] analysis was well supported and explained." Pl.'s Objection 2 (quotation marks omitted). Plaintiff elaborates: "The ALJ does evaluate [sic] any current treatment with regards to his HIV infection, just simply cherry-picks the medical records looking for non-relevant medical records to substantiate his decision." *Id*. at 3.

This, however, does not qualify as "an 'objection' as that term is used in this context." *See Aldrich v. Bock*, 327 F. Supp. 2d 743, 747–48 (E.D. Mich. 2004) (Cleland, J.). As Judge Cleland explains, "An 'objection' that does nothing more than state a disagreement with a magistrate's suggested resolution, or simply summarizes what has been presented before, is not

-18-

an 'objection' as that term is used in this context." *Id*. at 747.  Consequently, "A general objection to the magistrate's report has the same effect as a failure to object." *Id*. at 747–48.

Plaintiff's "objection" will be overruled.

## B

Next, Plaintiff objects that Judge Scallen erred because "[s]ide effects of HIV medications cause serious and substantial side effects that [were] ignored by the ALJ."  Pl.'s Objection 3.  (In his objection, Plaintiff does not identify the particular side effects that Judge Scallen allegedly ignored.)

A review of the record, however, demonstrates that Judge Scallen did not ignore any relevant medical records — much less any evidence of "serious and substantial side effects."

At the hearing, for example, Plaintiff testified that "I have uncontrollable bowel movements.  I'm very tired, nauseous . . . .  I get dizzy."  R. at 41.  Plaintiff also testified that he was "extremely weak" and could lift no more than 5–10 pounds.  R. at 49.  Judge Scallen did not find this testimony credible.  And substantial evidence supports that conclusion.

## 1

To elaborate, Plaintiff alleges an onset date of January 1, 2010.  The first medical evidence following this date comes in March 2010, when Plaintiff vomited and then went to the emergency room.  There, doctors found "Strength is 5/5 proximally and distally in both upper and lower extremities."  R. at 191.  The records also reflect that Plaintiff was "completely asymptomatic" of HIV.  R. at 192.  And Plaintiff's CD4 count was "in the 400[s], almost 500s." R. at 191.  Plaintiff did not complain of any side effects from his medication.

-19-

**2**

The next medical evidence comes in November 2010, when Plaintiff was again examined by a treating source (the Wayne State University Physician Group).  R. at 212–14.  Again, his condition was described favorably.  Plaintiff himself reported no headaches, fatigue, diarrhea, vomiting, or depression.  R. at 212–13; *see also* R. at 212 ("No new health problems to report.").  And again, the physical exam revealed Plaintiff's constitution to be both "[w]ell nourished" and "[w]ell developed."  R. at 213.

During this visit, Plaintiff also acknowledged that he "had a period of a few months stopping his meds completely in the spring of this year."  R. at 212.  And, although he resumed taking his medication in the summer of 2010, he also acknowledged "missing 1 or 2 doses weekly since then."  R. at 212.  Yet again, Plaintiff did not complain of any side effects from his medication.

**3**

A consultative examiner, Dr. Bedia, examined Plaintiff in January 2011.  Reviewing Plaintiff's symptoms, Dr. Bedia recorded "No nausea or vomiting."  R. at 202.  Dr. Bedia also reported that Plaintiff "complains of uncontrolled bowel movements since starting retroviral therapy. . . . He has occasionally lost control and soiled his under garments.  This makes him a little bit anxious for going outside."  R. at 201.

Like Plaintiff's treating physicians, however, Dr. Bedia gave Plaintiff's physical exam generally positive marks.  "Good muscle tone and mass," Dr. Bedia observed, noting: "Motor strength is 5/5 bilaterally."  R. at 202.

"Based on today's exam," Dr. Bedia concluded, "the patient does not have any physical restrictions for activity."  R. at 203.

**4**

Finally, in March 2011 Plaintiff was again examined by a treating source (the Wayne State University Physician Group).  Again, Plaintiff's physical exam was positive.  Again, he denied fatigue, diarrhea, and nausea.  R. at 209.  And again, his constitution was described as "[w]ell nourished and well developed."  R. at 210.

**5**

In sum, substantial evidence supports Judge Scallen's finding that Plaintiff did not suffer either  serious or substantial side effects from his HIV medication.  While Plaintiff testified that he did, *see* R. at 41, Judge Scallen did not find this testimony credible. R. at 18.  The Sixth Circuit cautions that an administrative law judge's "findings based on the credibility of the applicant are to be accorded great weight and deference."  *Walters v. Comm'r.*, 127 F.3d 525, 531 (6th Cir. 1997).  Here, substantial evidence supports Judge Scallen's finding.

Plaintiff's objection will be overruled.

**C**

Next, Plaintiff objects that he "had shingles.  This in itself would meet listing 14.08D3." Pl.'s Objection 3 (internal citation omitted).   Plaintiff's objection lacks merit.

Section 14.08D3 provides that a person may be found disabled if they have HIV and herpes zoster (shingles) that is either "[d]isseminated"[12] or "[w]ith multidermatomal eruptions that are resistant to treatment."  20 C.F.R. part 404, subpart P, app. 1, § 14.08D(3).

---

[12] The CDC explains: "People with herpes zoster most commonly have a rash in one or two adjacent dermatomes (localized zoster). The rash most commonly appears on the trunk along a thoracic dermatome. The rash

Here, there is no evidence in the record that Plaintiff's shingles were either disseminated or resistant to treatment. Moreover, prior to the alleged onset date, the rash had healed. And after the alleged onset date, there is no evidence that the rash returned.

Plaintiff's objection will be overruled.

**D**

Finally, Plaintiff repeats the argument made in his summary judgment motion that "[t]here is not a scintilla of evidence to support his RFC assessment that [Plaintiff] would be capable of work at the medium exertional level." Pl.'s Objections 4–5; *see* Pl.'s Mot. for Summ. J. 15 ("There is not a scintilla of evidence to support his RFC assessment that [Plaintiff] would be capable of work at the medium exertional level.")

Plaintiff also reiterates: "The ALJ found moderate limitations in concentration, persistence, or pace. Never [are] his determinations factored into the RFC assessment." Pl.'s Objections 4; *see* Pl.'s Mot. for Summ. J. 15 ("The ALJ further found that Plaintiff has moderate limitations in concentration, persistence, or pace. Yet there are no nonexertional limitations whatsoever in the ALJ's RFC determination.").

As noted, an "objection" that "simply summarizes what has been presented before . . . is not an 'objection' as that term is used in this context." *Aldrich v. Bock*, 327 F. Supp. 2d 743 at 747. Rather, such an assertion "has the same effect as a failure to object." *Id*. at 747–48. Plaintiff's "objection" will be overruled.

---

does not usually cross the body's midline. However, approximately 20% of people have rash that overlaps adjacent dermatomes. Less commonly, the rash can be more widespread and affect three or more dermatomes. This condition is called disseminated zoster."   CDC, *supra*, *at* http://www.cdc.gov/shingles/hcp/clinical-overview.html.

As an aside, the Court notes that even if the merits of this objection were considered, Plaintiff would nevertheless not be entitled to the relief he seeks. As Judge Whalen noted, "the RFC included a number of non-exertional limitations by precluding work requiring the climbing of ropes, ladders or scaffolds; frequent balancing; repetitive handling or fingering; concentrated exposure to unprotected heights and moving machinery; and limiting Plaintiff to 'simple, routine, and repetitive tasks.'" Report and Recommendation 16 (quoting R. at 17). Likewise, as Judge Whalen pointedly observed, "although Plaintiff was found to be capable of exertionally medium work, the hypothetical question's non-exertional qualifiers limited him a range of light and sedentary work." *Id.* (citing R. at 58).

Finally, the Court notes in passing that it agrees with Judge Whalen's thoughtful conclusion: "uphold[ing] the Commissioner's decision is not intended to trivialize Plaintiff's legitimate concerns brought on by the diagnosis of HIV/AIDS. While the non-disability finding for the relevant period is well articulated and clearly supported by substantial evidence, Plaintiff is not barred from filing a new claim if he believes his condition has worsened since the date of the ALJ's decision." *Id.* at 19.

**IV**

Accordingly, it is **ORDERED** that Plaintiff's objection to Judge Scallen's report and recommendation (ECF No. 13) is **OVERRULED**.

It is further **ORDERED** that the Judge Whalen's report and recommendation (ECF No. 12) is **ADOPTED**.

It is further **ORDERED** that Plaintiff's motion for summary judgment (ECF No. 9) is **DENIED**.

It is further **ORDERED** that Defendant's motion for summary judgment (ECF No. 10) is **GRANTED**.

It is further **ORDERED** that the findings of the Commissioner are **AFFIRMED** and Plaintiff's complaint (ECF No. 1) is **DISMISSED**.

Dated: March 22, 2013                          s/Thomas L. Ludington
                                               THOMAS L. LUDINGTON
                                               United States District Judge

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 22, 2013.

s/Tracy A. Jacobs
TRACY A. JACOBS